IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EMIL PAUL HAGBERG, JR.,    )
        )
        Plaintiff,    )
        )     No. 14 C 887
    v.    )
        )     Magistrate Judge
CAROLYN W. COLVIN, Acting    )     Maria Valdez
Commissioner of Social Security,[1]    )
        )
        Defendant.    )
        )

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision

of the Commissioner of Social Security denying Plaintiff Emil Paul Hagberg, Jr.'s

claims for Disability Insurance Benefits. The parties have consented to the

jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the reasons that follow, Plaintiff's motion for summary judgment [Doc. No. 13]

is denied.

## BACKGROUND

### I.    PROCEDURAL HISTORY

On September 9, 2011, Plaintiff filed a claim for Disability Insurance

Benefits, alleging disability since April 4, 2011. The claim was denied initially and

upon reconsideration, after which he timely requested a hearing before an

Administrative Law Judge ("ALJ"), which was held on November 26, 2012. Plaintiff

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

personally appeared and testified at the hearing and was represented by counsel. Plaintiff's wife, Kimberly Hagberg, and his pastor, Michael Dillon, as well as vocational expert Janice Hastert also testified. On December 14, 2012, the ALJ denied Plaintiff's claim, finding him not disabled under the Social Security Act. The Social Security Administration Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.     FACTUAL BACKGROUND[2]

### A.     <u>Background</u>

Plaintiff was born on January 28, 1971 and was 41 years old at the time of the ALJ hearing. Plaintiff had worked previously as a deli assistant, a mechanic and tire repairer, and a sales associate. He had last worked at Wal-Mart in the deli, but was fired after approximately four years. (R. 44.) Because his work involved food preparation, Plaintiff stated that he was unable to bring his own food into the work area and, because of his uncontrolled diabetes, he would get tired and would have difficulty with his vision and with thinking clearly, which ultimately resulted in his firing. (R. 44-45.)

### B.     <u>Medical Evidence</u>

Plaintiff began seeing Dr. Adam Wozniak in January 2010 because of his uncontrolled diabetes. (R. 312-13.) In his initial appointment, Plaintiff reported that he had previously controlled his diabetes, but had been unable to do so for the

_____

[2] The following facts from the parties' briefs are undisputed unless otherwise noted.

preceding two months. The results of Dr. Wozniak's physical examination, however, were normal. Dr. Wozniak diagnosed Plaintiff with "[b]enign essential hypertension controlled" and uncontrolled Type II diabetes mellitus. (R. 313.) He ordered prescription medication and a follow-up appointment one week later. (R. 313.) Plaintiff continued to see Dr. Wozniak (and, occasionally, other physicians in his group), through November 2010. During this time, Plaintiff continued to have difficulty controlling his diabetes, continually showing high blood sugar levels. (R. 306, 308, 310.) By June of 2010, he reported that his "blood sugar averages less than 250," but complained of cramps in his lower extremities. (R. 304.) The imaging studies resulting from those complaints, however, were negative. *Id.* (R. 304.) At an appointment a week later, Plaintiff was released to work without restriction. (R. 302.) Despite his uncontrolled blood sugar, however, Dr. Wozniak's treatment notes reflect normal findings in the musculoskeletal, neurological, and psychological areas. (R. 296, 298, 300, 301, 306, 308.)

Although its origin is not indicated in his June 2010 records, in August of 2010 Dr. Wozniak had prescribed Plaintiff Prozac, and at that appointment increased his dosage to "40 mg every day." (R. 300.) The treatment notes reflected that Plaintiff was "back at work and doing well," but that he "[w]ant[ed] to know if Prozac can be increased for anxiety symptoms." (R. 300.) The record also reflected that Plaintiff had been exercising three times weekly. *Id.* With the exception of being "[p]ositive for anxiety," Plaintiff's examination report was otherwise normal. *Id.* In the next follow-up, in September 2010, Plaintiff recorded blood sugar at 219

and "report[ed] that Insulin sometimes makes him sweat," but did not otherwise report symptoms and his physical and mental examinations were normal in all areas. (R. 298-99.) Plaintiff's diagnosis remained uncontrolled diabetes mellitus, hypertension and depression. (R. 299.) In November 2010, Plaintiff reported that his blood sugar was usually "200 in the morning" and his diabetes medication was adjusted. (R. 296-97.) Again, however, Plaintiff did not report any abnormal symptoms: he indicated no vision changes, no reported anxiety or depression, no memory lapses or loss, and no dizziness, fainting, or "sensory disturbances." *Id.* His physical examination similarly showed no abnormal results aside from mild erythema. (R. 296-97.) Plaintiff also did not report any psychological symptoms, but instead Dr. Wozniak recorded "no anxiety or depression." (R. 296.)

In March of 2011, Plaintiff was seen for a consultation with rheumatologist Dr. Safwan Sakr due to complaints of "long standing, wide spread body ache with fatigue, poor sleep and depression." (R. 341.) Plaintiff's physical examination was positive for fatigue weakness, but negative for loss of vision or doubled/blurred vision, and he had a normal gait. (R. 342.) However, Plaintiff showed tenderness at 18 of 18 fibromyalgia "tender points," and was diagnosed with fibromyalgia. (R. 344.) He also had "[d]iffusely tender peripheral joints but no swelling and all revealed full R[ange ]O[f ]M[otion]." (R. 343.)

In May 2011 Plaintiff was seen by Dr. James T. Bonucchi, an endocrinologist, in relation to his uncontrolled diabetes. He reported sweats, malaise, and fatigue. (R. 404.) He again reported impaired function, pain, joint stiffness, weakness, and

back pain, but denied visual changes. (R. 404-05.) However, his physical examination showed that he walked without assistance, was well-developed and well-nourished, and again produced no abnormal findings. *Id.* Dr. Bonucchi discussed medication changes with Plaintiff and emphasized "lifestyle changes," as well as ordering laboratory testing. *Id.* In June 2011, Plaintiff was seen for a follow-up by Dr. Charles K. Wiredu at the same doctors' group. (R. 384.) Plaintiff again reported pain, joint stiffness, and cramps related to his musculoskeletal system. (R. 385.) He denied worsening symptoms of anxiety, depression, or insomnia. *Id.* Again, Plaintiff's gait and station were normal, and he had "adequate muscle strength and tone," as well as the full range-of-motion in his neck, back, and extremities, and had an otherwise normal physical examination. *Id.* The same complaints and same examination findings were present at a follow-up in October 2011. (R. 403-06.)

Also in June of 2011, Dr. James W. Morgan performed a mental residual functional capacity analysis of Plaintiff's records. He found that plaintiff was moderately limited in six of twenty areas surveyed, but not significantly limited in all other areas. (R. 368-69.) In his narrative assessment, Dr. Morgan noted that Plaintiff had received regular treatment for depression, but had been prescribed medicine and "does not report significant problems with depression." (R. 370.) He also noted that Plaintiff reported that he was able to prepare simple meals, was able to drive and go out alone, but did not report any social activities and stated that he was short-tempered and experienced problems with concentration. (R. 370.) Subsequently, in December 2011, Dr. Morgan also performed the psychiatric review

technique on Plaintiff's medical records in December 2011. (R. 458-68.) He found that Plaintiff's depression was not severe, (R. 458), and that it produced mild limitations with regard to maintaining social functioning, but no limitation in other areas. (R. 466.) In discussing his findings, Dr. Morgan stated that, while Plaintiff had been diagnosed with depression, he was being treated with Prozac by his primary care provider, and had not sought or received specific psychiatric treatment. (R. 468.) Dr. Morgan also noted that Plaintiff had reported doing some household chores, driving, and shopping. *Id.* Plaintiff also reported that he attended church but was not social for long periods of time due to his short temper. *Id.*

In August 2011, Plaintiff was seen again by Dr. Sakr. Plaintiff's chief complaint was that he had experienced "jerky movement[s]" of his lower (and sometimes upper) extremities. (R. 414.) In addition to his other diagnoses, Plaintiff was diagnosed with restless leg syndrome. (R. 415.) Although all 18 fibromyalgia tender points were tender, Dr. Sakr noted no tender or swollen joints and that Plaintiff had full range of motion. (R. 415.) He also noted that Plaintiff had not tolerated his prescription for Prozac, and prescribed Cymbalta instead. (R. 414-15.)

In September 2011, Plaintiff presented to Baxter Regional Medical Center complaining of chest pain, which had been constant for about 48 hours. (R. 436.) He reported that he had had an episode of blurred vision, sweatiness, and chest pain about four days before. *Id.* He was admitted for testing related to a possible heart attack. (R. 437.) However, further testing was negative and he was sent home. (R. 422.) On November 1, 2011, he returned to Dr. Sakr, who recorded a "fair response

to the current [medication] regimen with better sleep and much less restless legs." (R. 456-57.) Dr. Sakr's physical examination again recorded that Plaintiff had no tender or swollen joints and had full range of motion. (R. 456.) The order was for Plaintiff to continue on his current medications. (R. 456.) At a follow-up appointment on November 29, 2011, Plaintiff for the first time reported pain in his upper right thigh, especially during driving. (R. 491.) Otherwise, however, he reported that he was "doing better on [his] current regimen." *Id.* Except for the pain in his right leg, Plaintiff again showed no tender or swollen joints, and no loss in range-of-motion. (R. 492.) On March 8, 2012 the Plaintiff again was reported as "doing well," and noted a "[g]ood response to treatment." (R. 482.) Dr. Sakr determined to continue Plaintiff's current medications at the same doses, and cleared him to resume aquatic aerobics three times per week. *Id.*

On May 3, 2012, Plaintiff reported to Ozarks Medical Center orthopedic clinic complaining of pain in his right shoulder. (R. 505-06.) The examining physician noted that Plaintiff was hesitant to raise his right arm "up any higher than 90 degrees," although he was able to raise the arm to about 160 degrees. (R. 506.) After additional imaging was performed, it was determined that Plaintiff had a torn rotator cuff which required surgery. (R. 508.) On July 18, 2012, Plaintiff reported to the emergency department due to pain in his right shoulder, "malaise, and recent black outs." (R. 531) He reported several "[b]lack out spells" which had begun a few days prior, in addition to increased pain in his shoulder. (R. 528.) He reported that he had been scheduled for surgery on his rotator cuff, which had been postponed

due to his elevated blood sugar and a urinary tract infection. *Id.* Plaintiff was diagnosed with near syncope, diabetes, and a "right shoulder – rotator cuff problem." *Id.* With the exception of the pain in his right shoulder, Plaintiff's examination results were normal. (R. 532.) Plaintiff's vital signs, test results, and radiologic studies returned as normal, and he was discharged. (R. 533-34.)

On August 28, 2012, Plaintiff underwent a successful surgery to his rotator cuff. (R. 510.) In follow-up treatment in November 2012, Plaintiff reported coldness and numbness of his right hand, extending to his fingers. (R. 562.) He also complained of constant pain in the shoulder on a five- or six-out-of-ten rating, which increased to a ten-out-of-ten rating with any movement. *Id.* He reported that the decreased strength and range of movement in his shoulder limited his ability to perform personal care activities and to hunt or fish. (R. 562.) He described his diagnosis to the physician as "ulnar nerve damage," but this does not appear to have been recorded in his records. (R. 562.) The physical examination did note that Plaintiff was "hyper-sensitive to light touch along ulnar [nerve] distribution" and at the site of his incision. (R. 563.) The range of motion in his shoulder was also limited from pain and guarding. (R. 563.) The physician noted that Plaintiff had "fair to good rehab potential," but that he expected slow progress. *Id.*

In November 2012, Plaintiff underwent an intake assessment at a behavioral healthcare provider. (R. 556.) In his initial assessment, Plaintiff reported that he had been in constant pain, and—due to his loss of income and his wife's illness—he had become very angry with his children, anger which had also strained his

marriage. (R. 556.) He reported his activities as "pretty much sit[ting] around during the day doing nothing," where before he was a hunter and fisherman. *Id.* The assessor determined that Plaintiff as had a low risk on a suicide risk assessment, the SAD PERSON tool. (R. 557-58.) In the mental status examination, the assessor noted that—although his mood was depressed—Plaintiff's thought processes were intact, judgement and insight was reported within normal limits, his attention and concentration were good, and his memory was intact. (R. 559.) Plaintiff was diagnosed with Major Depressive Disorder. (R. 560.)

C.   **Plaintiff's Testimony**

Plaintiff testified that he had been fired from his last job, working in the deli department of Wal Mart, due to his diabetes. (R. 44.) Because he was unable to keep food in the work area and was not permitted to retrieve it at well, he was unable to control the symptoms arising from his diabetes. (R. 44-45.) He had experienced blackouts and, although he hadn't had one "in a while," he was having them frequently while working. (R. 62.) Plaintiff testified that his diabetes also made him tired and that it made him sweat. He also testified that it was difficult to think at times: his head would "get[] real foggy," making it difficult to think. He would also experience problems with blurred vision, which happened "quite often," potentially as much as 15 percent of the day, for five minutes at a time. (R. 45-46.) He testified that his blood sugar currently measured around 400, that it had been at that level "for about two months now," (R. 42), and that it had not responded to his following his doctors' orders. (R. 49.)

Plaintiff also discussed his rotator cuff surgery, which had occurred eight weeks prior to the hearing. He was experiencing pain in his shoulder related to the surgery, (R. 41), as well as in his back, stomach, hands, and hips, which he associated with fibromyalgia. (R. 46.) He rated his pain, on a typical day, as a six or a seven on a one-to-ten scale. (R. 47.) The pain was severe and continual, and made it difficult to pick things up. *Id.* He also experienced numbness in his hands, which was constant. (R. 48.) The numbness rendered it difficult to hold items, and resulted in reduced sensation which, in turn, resulted in dropping things. (R. 48-49.) This problem was worse in his right (and dominant) hand. (R. 51.) Plaintiff's neck would also become stiff to the point where he would have difficulty turning his head. (R. 51.) He also had had bursitis in both hips, which produced constant pain at a level of four on a one-to-ten scale. (R. 52-53.) He also had previously experienced pain in his knees, but that had stopped, although Plaintiff reported that his knee would "give out" on him two to three times per day without warning. (R. 53-54.)

With respect to his depression, Plaintiff stated that he was unable to sleep, that he experienced crying spells, and that he had not seen his children because of related problems with anger. (R. 60.) He stated that he would have panic attacks where he would feel "really, really hyper" and it would be difficult to breathe. (R. 62.) While he had not had such experiences recently, it had happened "a lot" when he was working. *Id.* Plaintiff also stated that he slept only for two hours per night, which he suspected was related to his depression. (R. 52.)

With respect to his activities, Plaintiff testified that his social activities were limited to going to church and visiting with friends. (R. 55.) On an average week, he would leave the house three times, for about two hours at a time. He would go to church once a week, and see a friend about once a week. (55-56.) His friend lived about three miles away, and his wife would usually do the driving. (R. 56.) He testified that he did not drive because he was afraid his vision would blur, he got confused easily, and he had difficulty because of the problems with his hands and his feet. *Id.* However, he had driven to the friend's house within the last week because he didn't "want to feel totally helpless." *Id.* He also stated that he had difficulty concentrating, and would get confused if interrupted while performing tasks, reading, or watching television. (R. 57.) He had good days and bad days, and described a "good day" as one where he could take his dog for a walk and exercise; however, he had only two or three good days in a typical month. (R. 57-58.) Otherwise, he was able to "be productive" for a total of three hours per day, and was unable to maintain constant activity for more than 20 minutes because of his pain. (R. 58.) His normal routine was to eat breakfast, take his medicine, and to help his wife clean the house, but that that was the extent of his activity. (R. 59.)

D.    **Other Witness Testimony**

Plaintiff's wife, Kimberly Hagberg, also testified. (R. 65.) She stated that Plaintiff's depression had worsened over the past year. (R. 66.) Although she herself was disabled because of multiple sclerosis, Mrs. Hagberg did the majority of the household chores because Mr. Hagberg could not. (R. 67.) Plaintiff would go to the

grocery store with her, although he was not very helpful. *Id.* Because of the numbness in his hands, Plaintiff was unable to complete tasks like opening jars, and would drop things he tried to hold. (R. 67-68.) He was also unable to drive for long distances because he had difficulty with his vision and would forget directions. (R. 68.) Mrs. Hagberg also stated that Plaintiff had difficulty sitting for more than 15 minutes at a time, and could drive for about a half hour before needing to stop and stretch. She estimated he could stand for no more than a half an hour at a time and could lift a gallon of milk, but that problems with his grip made lifting difficult. (R. 69-70.) It was also difficult for Plaintiff to follow directions, and that he often forgot to do tasks that she requested he do. (R. 70.) Mrs. Hagberg testified that Plaintiff had blackout spells, which would occur once or twice per week while he was working. (R. 68.) She also observed that Plaintiff had difficulty controlling his emotions, and would experience crying spells. (R. 71.) It was also difficult, up to twice per week, to convince him to get out of bed. *Id.*

Plaintiff's pastor, Michael Dillon, also testified. Dillon had known Plaintiff for eight or nine years, and had seen him two to three times per week during that time. (R. 64.) He stated that Plaintiff had volunteered at his church's food pantry in the past, but had stopped because he was currently unable to do the work. *Id.* Dillon also stated that he used to hunt and fish with Plaintiff, but that Plaintiff had been unable to hunt or fish for about a year. *Id.* Dillon also noted that he had seen changes in Plaintiff's mood, and that Plaintiff "seem[ed] to be more depressed than he used to." (R. 64-65.)

### E.    **Vocational Expert Testimony**

After hearing testimony, the ALJ questioned Vocational Expert ("VE") Janice Hastert. He first asked Hastert about a hypothetical person with the same age, education, and work experience as Plaintiff, and a residual functional capacity ("RFC") limiting him to performing sedentary work, lifting 10 pounds occasionally, standing or walking for two hours and sitting for six hours of an eight-hour day with normal breaks. (R. 72.) Among others, the ALJ also limited the hypothetical individual to no overhead reaching with the right arm. *Id.* The ALJ stated that those limitations would preclude Plaintiff's past work, but that there were significant other jobs in the economy which the hypothetical individual was capable of performing. (R. 73.) The VE stated that this was still the case if the hypothetical individual was further limited to only "simple routine, repetitive tasks, involving only simple . . . work-related changes." *Id.* The answer did not change if the individual was further limited to only occasional contact with the public. (R. 74.)

Plaintiff's attorney asked if the VE's answer would change if, in addition to normal breaks and lunch period, the hypothetical individual needed an extra thirty minutes of off-task time per day. *Id.* The VE stated that this restriction would preclude all employment. *Id.* In response to further questioning, the VE also stated that there would be no work for the hypothetical individual if he was absent more than eight to ten days per year, (R. 75), could only work at half-pace for thirty minutes to one hour per day, *id.*, or would experience blackouts more than once or twice per year. (R. 76.)

**F.   ALJ Decision**

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his claimed onset date. (R. 15.) At step two, the ALJ concluded that Plaintiff had severe impairments of diabetes mellitus, fibromyalgia, obesity, "right shoulder rotator cuff tear, status post repair," right trochanteric bursitis, and restless leg syndrome. *Id.* The ALJ concluded at step three that the impairments, alone or in combination, did not meet or medically equal a Listing. (R. 17.) The ALJ then determined that Plaintiff retained the RFC to perform sedentary work, limited—among others—to standing or walking for no more than two hours per day and sitting for no more than six hours per day. (R. 18.) The ALJ concluded at step four that Plaintiff could not perform his past relevant work. (R. 26.) At step five, however, the ALJ concluded—based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC—that he was capable of performing jobs existing in significant numbers in the national economy, leading to a finding that he was not disabled under the Social Security Act.

## DISCUSSION

## I.   ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant is

disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520(a)(4). An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps 1 through 4. *Id.* Once the claimant has shown an inability to perform past work, the burden shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.  JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility

determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). In rendering a

conclusion, an ALJ "must build a logical bridge from the evidence to his conclusion,

but he need not provide a complete written evaluation of every piece of testimony

and evidence." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *Schmidt

v. Barnhart*, 395 F.3d 737, 744 (7th Cir.2005)) (internal quotation marks omitted).

## III.   ANALYSIS

Plaintiff argues that the ALJ erred in numerous ways when he assessed

Plaintiff's allegations as to the limiting effects of his symptoms and when he

determined Plaintiff's RFC. But, as described below, the ALJ properly considered

the extent to which Plaintiff's symptoms affected his ability to work and otherwise

properly determined his RFC. Accordingly, the ALJ's decision is affirmed.

### A.   <u>Assessment of Plaintiff's Symptoms</u>

Plaintiff challenges the ALJ's assessment of his claims as to the impact of his

symptoms on his RFC. "When a medically determinable impairment could

reasonably be expected to produce [the] symptoms" alleged by a claimant, the ALJ

must "evaluate the intensity and persistence of [those] symptoms" to determine the

extent to which they limit a claimant's capacity for work. *See* 20 C.F.R. §

404.1529(c)(1). Since the ALJ issued his decision in this case, the Social Security

Administration has issued new guidance on how the Administration assesses the

effects of a claimant's alleged symptoms: SSR 96-7p and its focus on "credibility"

has been superseded by SSR 16-3p in order to "clarify that subjective symptom

evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL

1119029, at *1. As SSR 16-3p is simply a clarification the Administration's interpretation of the existing law, rather than a change to it, it can be applied to Hagberg's case. *See Qualls v. Colvin*, No. 14 CV 2526, 2016 WL 1392320, at *6 (N.D. Ill. Apr. 8, 2016).

Applying the new Ruling to Hagberg's case does not change the outcome, however, because—under either SSR 96-7p or SSR 16-3p—the ALJ did not err. Plaintiff contends that the ALJ erred in relying on his activities of daily living to find that his impairments were not as severe as alleged. He claims that, while the ALJ found that Plaintiff could perform "a full range of personal care and household tasks," the record showed that he needed help to perform those tasks, and that even the ability to perform those tasks does not equate to an ability to perform full-time work. (Pl.'s Mem. at 13-14.) It is true, as Plaintiff asserts, that the Seventh Circuit has repeatedly criticized the reliance on limited daily activities in finding against a claimant's alleged limitations, "repeatedly caution[ing] that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see also Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) However, daily activities are nonetheless a factor that an ALJ is required to consider by the regulations and the Administration's guidance, *see* 20 C.F.R. § 404.1529(c)(3)(i), and an ALJ does not err simply by doing so. *See Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007).

Although the ALJ did not specifically discuss all of the activities Plaintiff reported being able to perform, in his self-reported daily activities Plaintiff stated that his daily activities consisted of brushing his teeth, eating breakfast, and taking his medications. (R. 230.) He was able to complete basic personal care activities such as dressing, bathing, and shaving, although with pain. (R. 231.) He prepared meals once or twice a week and could clean, although cleaning would take him "all day." (R. 232.) He was able to drive and ride in a car, and shopped for food one time per week. (R. 233.) In this case, the ALJ did not give extensive treatment to Plaintiff's activities of daily living. He did, however, stated that Plaintiff "can perform a full range of personal care and household tasks despite his symptoms . . . ." (R. 24.) Although not specifying which tasks Plaintiff was able to complete, the ALJ stated that "the fact that [Plaintiff] is able to perform these tasks, and apparently has been able to do so throughout the duration of his alleged disability, demonstrates he retains the ability to perform within the residual functional capacity outlined above." (R. 25.)

Plaintiff is correct that, especially given the ALJ's lack of further discussion about how his activities of daily living contradicted his statements as to the limiting effects of his symptoms, his daily activities alone did not support the conclusion that he was capable of light work on a full-time basis. *See Bjornson*, 671 F.3d at 647 (holding that ALJ erred in finding claimant's ability to "walk up to one block, sit or stand for up to 15 minutes, lift 10 pounds, bathe and dress normally, and even drive and shop" to discredit assertions as to symptoms in part because claimant "had

never testified that she was immobilized"); *see also Punzio v. Astrue*, 630 F.3d 704 (7th Cir. 2011) (holding that claimant's "ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace"). It is not clear (and the ALJ did not specify) how the ability to perform the limited daily activities suggested by Plaintiff equated to the ability to perform full-time work at the light exertional level.

However, even though the ALJ's reliance on Plaintiff's daily activities constituted error, the error in this case was harmless. An ALJ's determination as to the effects of a claimant's symptoms need not be "flawless" in order to avoid being "patently wrong." *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). In this case, the ALJ provided other reasons to support his determination—aside from Plaintiff's daily activities—which are supported by the record (and which Plaintiff does not challenge). First, the ALJ found that the medical evidence contradicted certain of Plaintiff's subjective complaints. While Plaintiff complained about pain in his back and lower extremities, the record was devoid of findings to support these claims. Specifically, the ALJ cited Plaintiff's treatment records revealing no tenderness and full range-of-motion in Plaintiff's joints and extremities, as well as full motor strength and normal gait. (R. 23-24). Similarly, with respect to Plaintiff's mental impairments, the ALJ noted that—despite Plaintiff's complaints as to cognitive limitations—numerous medical assessments which had shown Plaintiff to have good memory and cognitive function within normal limits. (R. 454, 559.) Although not dispositive, the ALJ's consideration of the medical evidence was

proper in considering the limiting extent of Plaintiff's symptoms. *See Schmidt*, 496

F.3d at 844 (upholding ALJ's finding as "supported by evidence in the medical

record indicating that [claimant] regularly exhibited normal neurological findings,

strength, reflexes, and sensation"); *see also Sienkiewicz v. Barnhart*, 409 F.3d 798,

804 (7th Cir. 2005) ("An ALJ may not disregard . . . subjective complaints of pain

simply because they are not fully supported by objective medical evidence. But a

discrepancy between the degree of pain claimed by the applicant and that suggested

by medical records is probative of exaggeration.") (internal citations omitted).

Furthermore, the ALJ did not discount Plaintiff's statements as to the effects

of his symptoms based simply on the medical record alone. *See* 20 C.F.R. §

1529(c)(3). He also noted that, despite claimant's testimony that he experienced

pain from his "shoulders down," (R. 41-42), and that the pain had remained

constant or had gotten worse since 2011, (R. 63), his treatment notes over that

period often reflected no complaints of back, muscle, or joint pain—other than in his

shoulder—over that time. (R. 23, 429-30, 482, 532.) This was also an appropriate

consideration. *See* 20 C.F.R. § 1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *8

(stating that, in determining extent of impairment from symptoms, Administration

"will compare statements an individual makes in connection with the individual's

claim for disability benefits with any existing statements the individual made under

other circumstances"); *see also* SSR 96-7p, 1996 WL 374186, at *5. And while

Plaintiff attributed the continued pain in his right shoulder, arm, and hand in part

to ulnar nerve damage, the ALJ correctly noted that there was no such diagnosis

present in Plaintiff's medical records. (R. 22.) The ALJ also noted that Plaintiff had been prescribed conservative treatment—a course of physical therapy in which his outlook for recovery was assessed as "good"—as rehabilitation from his rotator cuff surgery. (R. 24.) These were also proper considerations. *See Simila*, 573 F.3d at 519 (upholding finding based in part on "relatively conservative" treatment consisting of "various pain medications, several injections, and one physical therapy session"); SSR 16-3p at *8 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."); *see also* SSR 96-7p, 1996 WL 374186, at*7. Finally, the ALJ did not wholly ignore Plaintiff's claims but partially credited his testimony as his symptoms and limited his RFC accordingly. (R. 25.) *See Schmidt*, 496 F.3d at 844 (7th Cir. 2007) (upholding determination in part because "the ALJ did not totally discount [claimant]'s testimony regarding how her pain affected her ability to perform certain activities, as evinced by the ALJ's decision to limit [her] range of work to sedentary").

Relatedly, Plaintiff argues that the ALJ also erred by discounting the testimony of two other witnesses, his wife Kimberly Hagberg and his pastor Michael Dillon. In his decision, the ALJ stated that he had considered the testimony of these two witnesses, but that the witnesses' "testimony, overall, follows the [Plaintiff]'s subjective reports but does not establish the claimant is unable to perform work-related activity within" the assigned RFC. (R. 25.) The ALJ also stated that he gave

"little weight to this testimony for the same reasons [he found] the claimant less than fully credible . . . ." *Id.* When determining disability, an ALJ must consider opinion evidence from "other sources" in addition to medical sources. *See* 20 C.F.R. § 404.1513(d). This includes "[o]ther non-medical sources" such as spouses and clergy. *Id.* § 1513(d)(4). "In considering evidence from 'non-medical sources' who have not seen the individual in a professional capacity, such as spouses, parents, friends, and neighbors," [an ALJ] it [is] appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-3p, 2006 WL 2329939, at *6.

Plaintiff's pastor, Michael Dillon, testified that while Plaintiff used to come to volunteer at a food pantry, "he is unable to do that now." (R. 64.) Mr. Dillon also stated that, while he was "pretty good friends" with Plaintiff and that they used to hunt and fish together, Plaintiff was unable to do so within the last year. *Id.* Dillon also recalled "on several occasions" seeing Plaintiff moving his fingers purportedly as a result of pain, and that he had "noticed [Plaintiff] had started having some problems picking things up and dropping things and that's part of the reason he's not been helping at the food pantry." (R. 65.) Dillon also stated that he had "noticed mood changes," and that Plaintiff "seems to be more depressed than he used to." (R. 65.) Plaintiff's wife, Kimberly Hagberg, also testified. She stated that, since Plaintiff had been unable to work, she had noted that "his self-esteem is down" and that his depression had been worsening. (R. 66-67.) Although Plaintiff was able to do

shopping, it was "not a quick in and out," and Plaintiff was also unable to mow the lawn. (R. 67.) She stated that Plaintiff was unable to open a jar, and that he "drops things with his hands," and that he sometimes had difficulty showering. (R. 67-68.) Mrs. Hagberg also stated that Plaintiff was "not able to drive the distance that he used to be able to drive," and that—when he was working—he reported blackouts "maybe once or twice a week." (R. 68.) She believed her husband could neither sit nor stand for more than a half hour at a time, and that he was unable to lift more than a gallon of milk. (R. 69-70.) She also stated that he had concentration problems. (R. 70-71.)

Plaintiff claims that the ALJ failed to provide adequate consideration to the testimony of Mrs. Hagberg and Mr. Dillion in discrediting their testimony. He argues that the ALJ failed to follow SSR 06-3p, and claims that the case should be remanded because the "ALJ should consider the nature and extent of the witness's relationship with the claimant, the consistency with other evidence, and other factors that tend to support the witness's statements" in assessing this evidence. However, while not specifically discussing the length of the relationship between Plaintiff and his wife and pastor, the ALJ made clear that, because these sources served largely to repeat Plaintiff's claims as to the limiting effects of his symptoms, the reasons applicable to the ALJ's determination of Plaintiff's testimony with respect to his symptoms applied to these witnesses as well. (R. 26.) Although brief, the ALJ appropriately noted that the testimony of the two witnesses was largely a recitation of Plaintiff's subjective complaints, and appropriately linked his analysis

of Plaintiff's allegations as to the effects of his symptoms and its comparison to the medical evidence to his assessment of these witnesses. As the testimony of these witnesses relied on the same symptoms and underlying bases as Plaintiff's own testimony in this case, the ALJ did not err in discounting them for the same reasons. In this case, the ALJ provided adequate treatment of the other source evidence. *See Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) ("[Claimant]'s brother Roland's testimony did not constitute a separate "line of evidence." Rather, it served strictly to reiterate, and thereby corroborate, [claimant]'s own testimony concerning his activities and limitations. To the extent ALJ Bartelt found [claimant]'s testimony concerning his disabling pain and physical limitations to be untenable when contrasted with his reported daily activities and the relevant medical evidence, he necessarily found [the brother's] supporting testimony similarly not credible."); *see also* SSR 06-3p ("The weight to which ["other source"] evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors . . . .").

In support of his argument, Plaintiff cites to *Mazzuca v. Colvin*, No. 12 C 2907, 2013 WL 1343344 (N.D. Ill. Apr. 2, 2013). In that case, the District Court— remanding on other grounds, also noted that it found "[t]he ALJ's brief consideration of [the Plaintiff's wife]'s testimony troubling . . . ." *Id.* at *14. In that case, while the testimony of Plaintiff and his wife had been largely consistent, the ALJ had given the wife's testimony "little weight" while crediting Plaintiff's

testimony to a greater extent. *Id.* at *15. In that situation, the District Court noted that "[t]he ALJ should explain more fully why such similar testimony should have been assessed differently." *Id.* In this case, in contrast, the ALJ noted the similarity of the testimony but found that such testimony arose largely from a repetition of Plaintiff's subjective complaints, and appropriately referred to his analysis of Plaintiff's testimony, crediting the other witness's statements to the same extent as Plaintiff's. (R. 26.) Furthermore, although arguing that the ALJ did not appropriately consider the evidence under SSR 06-3p, Plaintiff does not detail— aside from addressing the ALJ's determination of his own testimony—how this testimony supported his application and how that support was misconstrued by the ALJ. There was no error in this case.

**B.     The ALJ's RFC Determination**

Plaintiff argues that, in determining his RFC, the ALJ erred with respect to both its physical and mental components. The RFC is "the most [a claimant] can still do" despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and in forming an RFC the ALJ must consider "all relevant medical and other evidence." *Id.* § 404.1545(a)(3). Although it is the claimant's duty to submit evidence to the Administration, the Administration also has a responsibility to assist a claimant in developing a complete medical record. *See* 20 C.F.R. § 404.1512(c)-(d).

Plaintiff argues that the ALJ erred in evaluating his physical impairments, evaluating his mental impairments, and failing to consider evidence supporting his claim. But because the ALJ properly considered Plaintiff's physical and mental

impairments with respect to the record in the case, and because he was not required to seek additional evidence on the record before him, there is no error.

### 1. Evaluation of Plaintiff's Physical Impairments

Plaintiff first argues that, in determining his RFC, the ALJ "relied on no medical opinions to generate the physical RFC" and instead "created his own out of whole cloth." (Pl.'s Mem. at 7.) In considering the evidence "[a]n ALJ may not 'play doctor' by substituting his opinion for that of a physician. The ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record." *Seamon v. Astrue*, 364 F. App'x 243, 247 (7th Cir. 2010). In this case, no medical source provided a function-by-function assessment of Plaintiff's residual functional capacity, and Plaintiff did not submit such an assessment from any of his treating physicians.[3] In his decision, however, the ALJ limited Plaintiff's RFC to performing sedentary work, *see* 20 C.F.R. § 1567(a), standing or walking for no more than two hours and sitting for no more than six hours of an eight-hour day, and to not "reach[ing] overhead with this [sic] right arm," among others. (R. 18.)

Plaintiff contends that, in determining his RFC in this case, the ALJ "played doctor" and drew his own (prohibited) medical conclusions from the evidence. Although he does not state so explicitly, implicit in Plaintiff's claim is the argument

---

[3] At the end of the hearing in front of the ALJ, Plaintiff's counsel stated that further medical records would be submitted to the ALJ, although the ALJ declined to hold the record open, given the pendency of the case. (R. 13, 76-77.) However, while some additional medical records were submitted and considered by the ALJ, (R. 13), no RFC assessment from Plaintiff's treating physicians is present, and Plaintiff makes no argument that such evidence was wrongly excluded from the record.

that an ALJ cannot reach a RFC determination in the absence of an explicit function-by-function analysis performed by a medical source. But this is incorrect. The Seventh Circuit has specified that, while "an ALJ must consider the entire record [in formulating an RFC] . . . the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." *Schmidt*, 496 F.3d at 845. The ALJ's "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). SSR 96-8p, 1996 WL 374184, at *7. The ALJ's RFC determination does not fail simply because there was no function-by-function analysis submitted by a physician.

The cases cited by Plaintiff in support of his argument do not require otherwise, and show that the ALJ did not "play doctor" in this instance. In all of the cited cases, the Seventh Circuit reversed the ALJ's decision because the ALJ— without relying on a medical opinion—discredited or failed to address medical evidence which contradicted the ultimate RFC determination. In *Bates v. Colvin*, the ALJ failed to provide a "good reason" for discounting the treating physician's opinion as to the claimant's RFC and instead imposed her own limitations without the benefit of other medical evidence to support them; in such a case there was "no other medical opinion for the ALJ to fall upon," and the Court found that it was the ALJ's "responsibility to recognize the need for additional evaluations." *Id.* at 1101. Similarly, in *Green v. Apfel*, the Seventh Circuit reversed the ALJ's finding that a

claimant—who had "long suffered from emphysema, and . . . underwent a major operation on his lungs to remove large emphysematous bullae (growths) in them"—was capable of performing medium work because the ALJ drew unwarranted conclusions from some medical evidence and also overlooked contrary evidence in reaching his conclusion. 204 F.3d 780, 781-82 (7th Cir. 2000). And in *Bailey v. Barnhart*, the ALJ not only (improperly) rejected the treating physician's RFC assessment but also rejected the other RFC assessments of record, and then constructed a "middle ground" RFC incorporating elements of both opinions. 473 F. Supp. 2d 822, 838-39 (N.D. Ill. 2006). In this circumstance, the Seventh Circuit held that the ALJ "played doctor" because it was "not clear to [the] Court where the ALJ found any medical evidence to support [his] finding" as—despite having stated that she rejected treating physician's assessment—the ALJ nonetheless credited that assessment to an unknown extent in constructing the RFC. *Id.* at 839. Similarly, in the other cases cited by Plaintiff, the ALJ rejected a treating physician's opinion and imposed lesser limitations on a claimant's RFC without detailing any medical evidence supporting those abilities. *See Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009); *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996).[4]

---

[4] In the final sentence of his discussion of the RFC, Plaintiff states: "Indeed, the ALJ failed to consider the aggregate of the Plaintiff's impairments as required by SSR 96-8p and 20 C.F.R. § 1523 and incorporate them into the hypotheticals, requiring remand if not reversal." (Pl.s Mem. at 12.) However, Plaintiff does not provide any argument as to how the ALJ failed to consider his impairments in the aggregate. And, in support of his argument, Plaintiff cites to *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003), a case which simply states that, in assessing disability, and ALJ must "consider the aggregate effect of this entire constellation of ailments–including those impairments that in isolation are not severe." Other than failing to credit Plaintiff's testimony as to the extent of

In this case, in contrast, he ALJ did not reject a medical opinion or overlook any contrary medical evidence in reaching the RFC, but instead examined Plaintiff's medical records and drew inferences from them. The ALJ conducted an extensive review of the records from Plaintiff's treating sources as described above, cited to the medical evidence of record showing that—despite his allegations as to disabling pain—Plaintiff's physicians had consistently recorded normal gait, strength, and range of motion in his examinations, (R. 20-22;), and that, other than reports of his shoulder pain, Plaintiff had not made complaints with respect to difficulty standing and walking to his treating providers. (R. 23, 429-30, 482, 532.) Furthermore, with respect to Plaintiff's shoulder pain, the ALJ noted that Plaintiff's physical therapist noted a good potential for rehabilitation, despite the pain Plaintiff reported at that appointment. (R. 564.) Plaintiff points to no medical evidence contradicting these conclusions; instead, the only contrary evidence was the testimony of Plaintiff and his witnesses as to the functional effects of his limitations, which the ALJ appropriately analyzed as described above. This therefore is not a case where there the ALJ determined a claimant's functional abilities were greater than that those alleged without support from the medical source. *Cf. Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (finding ALJ's RFC determination unsupported where the claimant "produce[d] . . . medical evidence that tremors make it difficult for her to use her hands" and noting that, "[i]f the ALJ found this evidence insufficient, it was her responsibility to recognize the need

---

his impairments, Plaintiff does not specify how the ALJ failed to consider his impairments in combination.

for additional medical evaluations"). Instead, the ALJ's "opinion reflects a thorough review of [Plaintiff]'s medical records and a reasonable weighing of the evidence both for and against greater RFC limitations." *Seamon*, 364 F. App'x. at 248; *see also Back v. Barnhart*, 63 F. App'x 254, 259 (7th Cir. 2003) (holding that ALJ was did not "play doctor" in evaluating treatment notes to determine RFC).

Plaintiff also makes two more specific arguments related to his RFC. In the first, he contends that "as to [his] chronic shoulder pain, the ALJ simply plays doctor in assuming that by fair to good rehabilitation potential in physical therapy, the only restriction in the RFC should be for no overhead reaching." (Pl.'s Mem. at 11.) But the ALJ did not "play doctor": instead, Plaintiff's treatment notes immediately following the surgery showed Plaintiff had a decreased range of motion in his shoulder with accompanying pain, and had difficulty raising his arm higher than 90 degrees, (R. 563), which the ALJ appears to have credited in constructing this limitation. And, in that same treatment note, Plaintiff's physical therapist noted short- and long-term goals of restoring strength and range-of-motion to the shoulder and reported Plaintiff's potential for rehabilitation was good, (R. 564), conclusions which the ALJ explicitly acknowledged in formulating the RFC. (R. 24.) In support of his argument on this point, Plaintiff cites to *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). But, in that case, the ALJ made an erroneous decision to credit the opinion of one medical expert at the expense of Plaintiff's treating physician. *Id.* Again, in this case there was no treating physician's opinion for the ALJ to discredit, and Plaintiff does not point to any other medical evidence (other

than his own statements as to the effects of his limitations, as discussed above) which shows that he had lesser abilities than those ascribed by the ALJ. The ALJ did not err in this respect.

Plaintiff also argues that the ALJ "played doctor" when he determined that, "to the extent that diabetes may be the cause [of Plaintiff's cognitive limitations], I cannot ignore medical information in the records that strongly suggests [he] has failed to appropriately manage his condition," and concluded that "better control through lifestyle changes such as diet would ameliorate the effect of these symptoms." (R. 24.) Plaintiff is correct that this is a medical conclusion for which the ALJ did not have adequate support: while it is true that Plaintiff reported a poor diet and was advised by his physicians to change this, no physician linked Plaintiff's poor diet to his symptoms or suggested that "lifestyle changes" would alleviate any alleged symptoms. The ALJ's finding on this point therefore was erroneous. *See Engstrand v. Colvin*, 788 F.3d 655, 660-61 (7th Cir. 2015) ("[The doctor] placed in the same sentence his observations about [claimant's] complaints of pain and [claimant's] ability to feel the monofilament, but he did not say that any correlation existed between these observations. Rather, the ALJ apparently assumed a connection. Thus . . . the ALJ was inappropriately 'playing doctor.' "). Given that the ALJ's decision was otherwise amply supported as described above, and that Plaintiff has failed to offer any evidence other than his own statements contradicting those conclusions, however, the decision is "overwhelmingly supported by the evidence," and any error in this respect is harmless. *See Spiva v. Astrue*, 628

F.3d 346, 353 (7th Cir. 2010); *Polchow v. Astrue*, No. 10 CV 6525, 2011 WL 1900065, at *14 (N.D. Ill. May 19, 2011) ("To the extent [claimant] claims the ALJ 'played doctor' . . . this error is harmless given the overall strength of the record.").

Plaintiff argues—implicitly with respect to the RFC determination in general and explicitly with respect to his fibromyalgia—that the ALJ should have ordered that an additional physician render an opinion as to the functional limitations arising from Plaintiff's impairments. (Pl.'s Mem. at 11.) When the record does not provide medical evidence sufficient to determine whether or not a claimant is disabled, the Administration "may ask [the claimant] to have one or more physical or mental examinations or tests" at the Administration's expense. *Id.* § 404 1517. However, Plaintiff has pointed to no authority stating that a physician must perform an explicit function-by-function analysis of Plaintiff's capabilities in order to make an RFC finding, and the only specific evidence which Plaintiff argues necessitated an additional medical opinion is his complaints of "arthralgias, joint stiffness, myalgias, muscle cramps and back pain" (Pl.'s Mem. at 11) as reported to Dr. Wiredu in October 2011. (R. 385.) But this is simply another argument as to the ALJ's assessment of Plaintiff's own statements as to the limiting extent of his symptoms, which are not medical evidence, *see Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), and the only authority Plaintiff cites in support of his argument is *Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996), a case which similarly discusses an ALJ's errors in assessing a claimant's allegations as to the limitations imposed by his symptoms. *See id.* There was simply no medical evidence in this case which

required the ALJ to seek an additional medical opinion. And, as discussed above, the ALJ adequately addressed Plaintiff's allegations as to the extent of his symptoms, specifically discussing the treatment note cited by Plaintiff. (R. 22.). Plaintiff's argument on this point is unavailing. *See McFadden v. Astrue*, 465 F. App'x 557, 560 (7th Cir. 2012) (no additional testing necessary as "the evidence was neither unclear nor incomplete" where ALJ "explained that [claimant] was taking medication to treat her depression and that no treating physician suggested work-limitations for [claimant] because of her depression, and [claimant] has not suggested why this explanation is flawed").

### 2. Evaluation of Plaintiff's Mental Impairments

Plaintiff also argues that the ALJ erred in finding that his mental impairment was not severe. A severe impairment is one "which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see also id.* § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). A determination of severity at step 2 involves an ALJ's consideration of the medical evidence and, in certain circumstances, a claimant's alleged symptoms as well. *See Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015); SSR 96-3p, 1996 WL 37418.

Plaintiff argues that, in finding his mental impairment nonsevere, the ALJ improperly relied on the opinion of Dr. James Morgan—conducted before Plaintiff

began psychiatric treatment—as well his score on a suicide risk assessment tool.[5] (Pl.'s Mem. at 11-12.) It is true that, in making his findings, Dr. Morgan noted as a partial justification that Plaintiff had not sought medical treatment, (R. 370), and that this this opinion was rendered before Plaintiff subsequently underwent his evaluation for psychiatric treatment (although no further treatment records are present in the record). Plaintiff also argues that the ALJ performed a "lay interpretation of the intake forms" when he relied in part on Plaintiff's score on the suicide risk assessment in determining severity.

Even assuming the ALJ erred in both instances, however, the ALJ's severity determination was otherwise supported by substantial evidence, and those errors are harmless. While it is true that Plaintiff's one instance of mental health treatment in the record may have somewhat undermined the rationale for Dr. Morgan's conclusion, that intake form merely confirmed Plaintiff's preexisting diagnosis of depression and did not add any additional diagnoses or contain any additional findings which differed from Plaintiff's previous diagnoses and examinations, (R. 556-60), as the ALJ noted in rendering his opinion.[6] Furthermore,

----

[5] The tool employed was the "SAD PERSONS" scale, "[a]n 'easily learned scale' using 10 major risk factors." Phyllis Coleman & Ronald A. Shellow, *Suicide: Unpredictable and Unavoidable-Proposed Guidelines Provide Rational Test for Physician's Liability*, 71 NEB. L. REV. 643, 693 n.62 (1992) (quoting William M. Patterson et al., *Evaluation of Suicidal Patients: The "SAD PERSONS" Scale*, 24 PSYCHOSOMATICS 343, 345 (1983)). "SAD PERSONS" forms an acronym for the ten factors. *See id.* Plaintiff's score of four was in the lowest category (one through five), which indicated "May be able to discharge." (R. 558.)

[6] The intake was conducted by Christy Gilbert, who does not appear to be a physician or psychologist; accordingly, Ms. Gilbert was not an "acceptable medical source" whose opinion could be used to establish the existence of an impairment. *See* 20 C.F.R. §§ 404.1513(a); 404.1527(a)(2). Nonetheless, the ALJ appropriately considered this evidence in conjunction with the other evidence in determining the severity of Plaintiff's impairments as required by the regulations. *See id.* § 1513(d)(1).

the two bases challenged by Plaintiff were not the only bases for the ALJ's finding as to severity; he also noted that Plaintiff's treatment notes over time consistently recorded normal examination findings with respect to Plaintiff's insight, judgment, and memory. (R. 16-17, 20-23.) These findings—again which Plaintiff does not challenge—provided substantial evidence to find that his mental impairment was not severe, even if the ALJ had otherwise erred. *See Pepper*, 712 F.3d at 366 (holding no error in finding depression nonsevere where ALJ relied on treatment notes demonstrating "no abnormalities in [claimant's] insight or judgment, orientation, memory or impairment, and mood").

Furthermore, even were the ALJ to have erred in this finding, any such error would be harmless. "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. Therefore, the step two determination of severity is 'merely a threshold requirement.'" *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (quoting *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)); see also SSR 96-3p, 1996 WL 374181, at *2. Here, despite finding Plaintiff's mental impairment to be nonsevere, the ALJ nonetheless considered that impairment rendering the RFC, and Plaintiff does not challenge the ALJ's RFC determination other than to challenge the ALJ's assessment of Plaintiff's allegations as to the extent of his symptoms. (R. 24-26.) Even if incorrect, the ALJ's finding that Plaintiff's mental impairment was nonsevere was harmless and does not require remand in this case. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("Deciding whether impairments are

severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment. Here, the ALJ categorized two impairments as severe, and so any error of omission [of a third] was harmless.").

### 3. Consideration of the Record as a Whole

Plaintiff also contends that, in constructing the RFC, the ALJ ignored evidence that Plaintiff's diabetes was uncontrolled. (Pl.'s Mem. at 8-10.) "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Arnett*, 676 F.3d at 592 ("Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence."). Plaintiff's claims on this point are meritless.

Plaintiff attempts to show error by pointing to the ALJ's citation of a treatment note from Dr. Wozniak—which the ALJ cited as showing "predominantly normal findings"—and claiming that this citation overlooked Plaintiff's consistently high blood sugar. (Pl.'s Mem. at 8.) However, this mischaracterizes both the treatment note and the ALJ's opinion. The ALJ explicitly noted that Plaintiff's diabetes was uncontrolled, that his "blood sugar testing remained above 200 despite several medication changes," (R. 20), and that he continually recorded elevated blood sugar levels over time. (R. 22.) The ALJ made specific mention that Plaintiff's readings had reached as high as 447. (R. 23.) But the ALJ noted that, "[o]ther than

increased blood sugar ratings, the objective findings were normal," (R. 20), which is borne out by the record itself. (R. 296-311.) The ALJ simply did not overlook the evidence as Plaintiff suggests.

Although he does not state so directly, the thrust of Plaintiff's argument is that—because his diabetes was uncontrolled—the ALJ should have credited his contentions as to the extent of his symptoms to a greater degree. (Pl.'s Mem. at 7-11.) But Plaintiff's argument erroneously confuses proof establishing the existence of an impairment with that establishing disabling effects *arising from* that impairment. "Conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment." *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *see also Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998); *Lomax v. Astrue*, No. 08 C 3540, 2010 WL 337654, at *14 (N.D. Ill. Jan. 29, 2010) ("[D]iagnoses alone mean little in terms of limitations; having an impairment is not the end of the quest for benefits—the impairment must be disabling.") (citing *Gentle*, 430 F.3d at 868). The ALJ was not required to credit Plaintiff's claims as to the limitations arising from his symptoms simply because he had a diagnosis which could have resulted in such limitations. This confusion between diagnoses and limitations is illustrated by Plaintiff's argument: he contends that, "[i]n finding that Plaintiff's D[iabetes ]M[ellitus] was not as severe as alleged, for example, the ALJ focuses on Dr. Wozniak's treatment, pointing to 'predominantly normal findings' . . . [y]et, treatment in that time period reflects a failure to control blood sugars . . . ."

(Pl.'s Mem. at 8). But, as discussed above, the ALJ acknowledged Plaintiff's high blood sugar but immediately after noted that, *despite* these elevated levels, "the review of systems and physical examinations continued to show predominately normal findings not at all correlative to the symptoms presently alleged." (R. 20), a finding which was supported by substantial evidence in the record as discussed above. The exact portion of the ALJ's opinion on which Plaintiff relies therefore contradicts his argument. And, aside from this contention, Plaintiff does not present any evidence related to his diabetes which the ALJ overlooked in reaching his decision. The ALJ did not err on this point.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 13] is denied. Judgment will be entered in favor of the Commissioner.

**SO ORDERED.**                    **ENTERED:**

**DATE:    April 27, 2016**        _____
                                   **HON. MARIA VALDEZ**
                                   **United States Magistrate Judge**